**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Stephen T. White, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of seven electronic devices, further described in Attachments A1–A7, which are currently in law enforcement possession, and the extraction from the devices of electronically stored information described in Attachments B1–B7.

2.      I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and have been since 2017. As an ATF SA, I have completed training in the field of criminal investigation through the Criminal Investigator Training Program at the Federal Law Enforcement Training Center and have completed specialized training in the fields of firearms, explosives, and arson—and the federal law and regulations pertaining thereto—through the ATF National Academy. I routinely refer to and utilize these laws and regulations during the course of my official duties. I am currently assigned to ATF Kansas City Group VII. My duties include the investigation of violations of federal firearms laws and regulations occurring within the Western District of Missouri. I was previously employed as a Criminal Intelligence Analyst with the Kansas City, Missouri, Police Department ("KCPD") working at the Midwest High Intensity Drug Trafficking Area ("HIDTA") Investigative Support Center, where I supported numerous narcotics trafficking and violent gang cases for two years. Prior to that, I worked as a Military Intelligence Officer in the United States Army and as an Intelligence Analyst for the Defense Intelligence Agency ("DIA"). Over the course of my prior duties, I have pursued professional development in the field of electronic forensic techniques and have obtained my

1

Certified Computer Forensic Examiner ("CCFE") from the Information Assurance Certification and Review Board ("IACRB") as well as my Cellebrite Certified Operator ("CCO") and Cellebrite Certified Physical Analyst ("CCPA") from Cellebrite Digital Intelligence Solutions. I have experience extracting digital evidence from cellular phones.

3.      I have conducted analysis of numerous telephone billing records for telephones used by controlled substance traffickers and gang members, as well as numerous social media accounts, including Facebook accounts, and the communications sent to and from those accounts. Consequently, I am familiar with the ways in which gang members, drug traffickers, and others engaged in criminal activity operate their illegal enterprises, including, but not limited to, their use of cellular telephones and their use of numerical codes and code words to conduct their transactions. I know that gangs and criminal enterprises often further their activities by using social media private messages, multiple cellular phones, multiple insulated contacts, pre-paid cellular phones, and phones designated to be used only for incoming or outgoing calls, which is also known as compartmentalization. I know that gang members frequently use cellular telephones subscribed to them in false names. The use of telephones in this manner is designed to help avoid detection by law enforcement.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Because this affidavit is submitted for the limited purpose of obtaining a search warrant, I have not included each and every fact known to me relating to the underlying investigation. Rather, I have set forth only the facts that I believe are necessary to support probable cause for the search warrant sought herein.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

5.     The property to be searched is described in Attachments A1-A7 and herein as follows:

a.     A black Apple iPhone in a black rubberized plastic phone case, with a white sticker on the rear side on which the words "Material Opulence" are written and monogrammed in black letters, seized from on top of **Jason LUMPKIN**'s bed at 3340 Elmwood Avenue, Kansas City, Missouri, and further described in Attachment A1 (hereinafter "**Target Device 1**");

b.     A black Apple iPhone in a pink case, serial number A1178, seized from inside a black zippered bag on the living room couch of 4021 Mersington Avenue, Kansas City, Missouri, and further described in Attachment A2 (hereinafter "**Target Device 2**");

c.     A gray Google Chromebook laptop computer, serial number 0JDB91AHB13552Y, seized from inside a suitcase in a bedroom of 4021 Mersington Avenue, Kansas City, Missouri, and further described in Attachment A3 (hereinafter "**Target Device 3**");

d.     A black Apple iPhone, seized from on top of the dresser in **Vincent JACKSON**'s room at 4022 Benton Boulevard, Kansas City, Missouri, and further described in Attachment A4 (hereinafter "**Target Device 4**");

e.     A black Apple iPhone with a crack on the rear side, seized from on top of the dresser in **Vincent JACKSON**'s room at 4022 Benton Boulevard, Kansas City, Missouri, and further described in Attachment A5 (hereinafter "**Target Device 5**");

f.     A Samsung Galaxy cell phone, serial number R5CT3250J4P, seized from a nightstand next to **Joshua FLUKER**'s bed at 350 East Armour Boulevard, Apartment 812,

Kansas City, Missouri, and further described in Attachment A6 (hereinafter "**Target Device 6**"); and

g.      A One Plus Nord N200 cell phone, model DE2118, seized from underneath a chair in the living room of 350 East Armour Boulevard, Apartment 812, Kansas City, Missouri, and further described in Attachment A7 (hereinafter "**Target Device 7**").

The foregoing devices are collectively referred to herein as the "**Target Devices**."

6.      The **Target Devices** are currently located at the ATF Kansas City Group VII Property and Evidence vault in Kansas City, Missouri, within the Western District of Missouri.

7.      Based on my training, experience, and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a) and 846, that is, manufacturing, distributing, or dispensing a controlled substance and conspiracy to manufacture, distribute, or dispense a controlled substance; 18 U.S.C. § 924(c), that is, possession of a firearm in furtherance of a drug trafficking crime; and 18 U.S.C. §§ 1959 and 1962, that is, violent crimes in aid of racketeering activity and racketeering (hereinafter the "**Target Offenses**"), have been committed by the **Target Subjects**, as defined below, and others known and as yet unknown. The applied-for warrants would authorize the forensic examination of the **Target Devices** for the purpose of identifying electronically stored data particularly described in Attachments B1–B7.

**PROBABLE CAUSE**

*Background Information*

8.     The Tra Side Gang (a.k.a., "TSG," "Third Wall," "Tra Wall," "Tra," "33rd Street," and "The 30's") is a neighborhood street gang that developed in the 3000 block of east Kansas City, Missouri, over 30 years ago.

9.     Click Clack Gang (a.k.a., "CCG") came together primarily under the leadership of prominent Tra Side Gang members as an alliance of several preexisting local neighborhood gangs around east Kansas City, including: Tra Side Gang, South Benton Gang, Park Side Greasies, 27th Street Pros, 68th Street, and Wabash Hustlers. These disparate neighborhood gangs forged an alliance partially based on interpersonal and familial connections between them but also, in part, to counter the growing influence of shared rival gangs. In particular, another alliance of local street gangs—51st Street and 12th Street—formed an alliance that came to be known as Five Ace Deuce (a.k.a., "5A2"). As these alliances took root, Click Clack Gang and Five Ace Deuce became the dominant large, umbrella gangs in the city, with the individual neighborhood gangs around the city picking sides and becoming subordinate groups of one of the two larger gangs, known as "sets."

10.     According to a 2012 report by the KCPD, violent encounters between members of Click Clack Gang and Five Ace Deuce were estimated to be responsible for 40 percent of violent crime in east Kansas City, Missouri.

11.     At their inception, Tra Side Gang and Five Ace Deuce sided with rival national gangs, the Crips and the Bloods, with Tra Side Gang and its sets identifying as Bloods, and Five Ace Deuce and its sets identifying as Crips. Over time, due to limited interaction with California-based Crip and Blood gangs, as well as shifting school boundaries in Kansas City, Missouri, both gangs slowly began incorporating individual members who identified with the Bloods or Crips.

5

While it generally holds true that Tra Side Gang members affiliate largely with Bloods, and Five Ace Deuce members tend to affiliate with Crips, there are many exceptions. Today, Blood or Crip identity is claimed by Kansas City-based gang members as a point of prestige to convey national significance. In practice, however, Blood or Crip affiliation has come to mean little compared to local Kansas City-based gang affiliations.

12.     Due to the early influence of Bloods and Crips street gangs on both Five Ace Deuce and Tra Side Gang, the gangs, along with their various sets, adopted common Blood and Crip organizational practices and terminology. Based on my training, experience, and knowledge of this investigation, I am aware that, in order become a member of Tra Side Gang an individual must be sponsored by a senior member of the gang who effectively vouches for the prospective member's usefulness and reliability in the gang. A new member brought into the gang is referred to as a "Little Homie," while the senior member of the gang who sponsors a Little Homie's induction is referred to as a "Big Homie." A given set's overall leader is referred to as the gang's Big Homie. A longstanding member with particular status in the gang is referred to as an "Original Gangster" or "OG." OG is used as an honorific title to show respect to a senior member in the gang.

13.     According to information provided by a cooperating defendant and original member of Click Clack Gang, prior to 2008 the various street gangs around Kansas City maintained little to no connection to one another. In the mid-2000s, much of the leadership of Tra Wall Gang had been imprisoned and a group of younger members rose to prominence in the absence of the gang's OGs. These members included: Kevion Bifford (a.k.a., Two Gunn Kevi), Andre Miller (a.k.a., Gangsta Dre) (deceased), Charles Williams (a.k.a., Chuck, a.k.a., Cheese), and Brandon Burtin (a.k.a., Three Deuce) (deceased). In addition to fellow members of Tra Wall

Gang, the group maintained friendships with members of various other street gangs around the city. The group of young gang members all enjoyed a song recently released by San Francisco based rapper Marvin Watson Jr. (a.k.a., Messy Marv) titled Click Clack, and adopted the name for their new amalgamated gang, referring to themselves collectively as "Click Clack Gang."

14.     When Tra Wall's leadership began being released from prison in 2008, the OGs were instantly at odds with the newly dubbed Click Clack Gang. The older members of Tra Wall didn't approve of the younger members' close association with other gangs and issued an ultimatum to pick a side: they were either Tra Wall or Click Clack. Tra Wall also resented Click Clack selling narcotics in their territory (around 33rd and Bales), bringing members of other gangs into the area, and refusing to pay Tra Wall leadership the proper respect.

15.     According to multiple KCPD reports at the time, hostility between the two groups came to a head in 2008 when Tra Wall member Myilan Norton (deceased) shot and killed Click Clack member Brandon Burtin (deceased). Click Clack Gang retaliated and killed Norton, and a string of retaliatory shootings and murders took place back and forth. Within a couple of years, Click Clack Gang won the struggle and the Tra Wall street gang effectively dissolved. Since that time, Click Clack Gang has come to be used as a synonym for Tra Side Gang, to refer to the specific set of Tra Side, and to denote the larger gang alliance. Tra Wall is rarely mentioned, with gang members typically opting to use the vaguer Tra Side Gang to refer, generally, to gangs in the 3000 block of east Kansas City.

16.     The subjects of this investigation are all members or associates of Click Clack Gang (hereinafter "**CCG**"), South Benton Gang (hereinafter "**SBG**"), and Park Side Greasies (hereinafter "**PSG**"). **SBG** and **PSG** identify as affiliated "sets" (or subordinate units) of **CCG**, and its members affirm membership to both gangs. **CCG**, **SBG**, and **PSG** have operated in the

7

Kansas City, Missouri, area since at least 2008. **CCG**'s primary stronghold is the 3000 block roughly between the Paseo and Emanuel Cleaver Boulevard (referred to as "the 30's" or "Tra") in Kansas City, Missouri. **CCG** also maintains other pockets of support and influence throughout east Kansas City to include areas surrounding: 43rd and Wayne Avenue, 27th and Benton Boulevard, and 68th Street west of 71 Highway. The **SBG** set is geographically centered around the intersection of 39th Street and South Benton Avenue and the **PSG** set originates from 33rd Street and Park Avenue.

17.     A rap song was posted to YouTube on October 24, 2013, by Kansas City rapper Antoine Crosby (a.k.a., "Young Twon"), titled *For Da 30's*. Crosby is an identified member of **SBG**. In the song, Crosby affirms loyalty to the Tra Side Gang/**CCG** and glorifies the gang's criminal exploits, stating, "*Shout out to the 30's my ni\*\*\*s died for it, cried for it, and served time for it. It's the mob.*" The song goes on to list Tra Side Gang's various sets around east Kansas City, stating, "*South Benton* [**SBG**] *and Park* [**PSG**]*, we really did that. Four Tra's* [43rd Street]*, and the Pros* [27th Street Pros]*, 68* [68th Street]*, and Click Clack* [**CCG**]*, and my TSG [Tra Side Gang] ni\*\*\*s really live that.*" From prior experience with gangs in east Kansas City, I know all of the gangs mentioned—**SBG**, Park Side Greasies, 43rd Street, 27th Street Pros, 68th Street, and **CCG**—have historically identified as sets of **CCG**.

18.     At one point in the song, several high-profile members of **CCG** and its sets, to include **SBG**, are mentioned by their street names. Some of the lines include: "*BG man this can't be right… then stay fucked up my friend Bizzle and Mike… Free Eazy… and my ni\*\*\* Chuck… Free Lewis and my ni\*\*\* Duck… Big ups to Two Glickers and Gangsta Dre ni\*\*\*s that paved the way for ni\*\*\*s in the Tra today.*" From my investigation, I am aware that "BG" is former leader of the Park Side Greasies set Marlon Randolph (deceased), "Bizzle" is current **PSG** leader Steven

Lee, and that "Eazy" and "Lewis" refer to **CCG** members Ezra Richardson and Lewis Anderson, respectively. "Chuck" and "Gangsta Dre" refer to senior **CCG** members Charles Williams and Andre Miller, and "Two Glickers" is a play on the name "Two Gunn," referring to the popular underground rapper and **CCG** figurehead Kevion Bifford.

19.     At the end of the song, Crosby makes specific mention of the close bond between **SBG**, Park Side Greasies, and **CCG**, stating, "*South Park Click, that's South Benton, Park, and Click Clack. If somebody got shot, close your mouth, we probably did that.*" From training and experience, I know "click" is a word often used to describe a smaller unit in a gang. The term can range from being a synonym for "set," sometimes spelled "clique," to describing an even smaller, closer-knit group within a set. I believe, in this context, use of the word "click" is meant as a double meaning, referring both to **CCG** and the common term for a subset of a gang, and is meant to refer to a particularly close relationship between **PSG**, **SBG**, and **CCG**, above and beyond the existing alliance among the various other **CCG** sets mentioned, that is referred to as South Park Click.

20.     **CCG**, **SBG**, and **PSG** are believed by law enforcement to engage in a variety of criminal activity, including dealing controlled substances and firearms, as well as violent felonies such as aggravated assault, aggravated robbery, and homicide. Members of **CCG**, **SBG**, and **PSG** use a specific set of words and symbols to denote membership in the gang. As described herein, it appears the members use social media to coordinate gang activity, distribute narcotics, buy and sell firearms, display gang signs, brag about criminal activities, and increase their reputation within the gang and community at large. The ATF is currently investigating members of the organization for controlled substance, firearm, and violent offenses. Thus far, the investigation has established evidence of narcotics distribution, money laundering, illegal use and possession of firearms, armed robbery, shootings, and other gang-related acts of violence.

*21.* ATF has identified several members and associates of **CCG**, **SBG**, and **PSG** in the Western District of Missouri, primarily in Kansas City, Missouri. Specifically, ATF has identified **David JONES** (a.k.a. "Davo"); **Nathaniel FINNEY** (a.k.a. "Nate"); **Jason LUMPKIN** (a.k.a. "Lump"); **Vincent JACKSON** (a.k.a. "Squeak" and "Vinny"); **Joshua FLUKER** (a.k.a. "Jizzle"); **Isaac WILSON** (a.k.a. "Hothead" and "Meces"); and **Deionte WILLIAMS** (a.k.a. "Tae"), who are actively affirming membership to **CCG** by associating and committing crimes with other members, exhibiting clothing attire, displaying gang signs, advertising the gang's name(s), and openly claiming allegiance to the gang. In addition, an investigation into the drug trafficking activities of the aforementioned members of **CCG** has led to the identification of additional participants in **CCG**'s drug conspiracy, but whose membership in the gang has not been confirmed, including: **Steffon RAINEY** (a.k.a. "Cheese" and "Monte"); **Reggie MCDOWELL** (a.k.a. "Dime" and "DB"); and **Shane MITCHELL** (a.k.a., "Biggz"). The foregoing individuals are collectively referred to herein as the **Target Subjects**.

### *Recent Investigation*

22. Through an ongoing criminal investigation into **CCG** over the last year, the **Target Subjects** have been identified as using social media to advertise and brag extensively about the sale of controlled substances in the Kansas City metropolitan area. **Target Subjects** have posted several photographs possessing firearms and bragging about possessing firearms in furtherance of drug trafficking activity. Such activity violates 21 U.S.C. §§ 841(a)(1) and 846; and 18 U.S.C. § 924(c).

23. On June 21, 2022, a federal grand jury seated in Kansas City, Missouri, returned an indictment charging **JONES, FINNEY, LUMPKIN, JACKSON, FLUKER, RAINEY, MCDOWELL, MITCHELL, WILSON**, and **WILLIAMS** with, among other things, conspiracy

to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 846. Warrants were also issued for their arrests.

24.     On June 22, 2022, the Honorable Brian W. Gaddy, United States Magistrate Judge, Western District of Missouri, signed warrants authorizing the search of a number of residences associated with the **Target Subjects**, including, for purposes of this warrant, 3340 Elmwood Avenue, Kansas City, Missouri (22-SW-00398-WBG), 4022 Benton Boulevard, Kansas City, Missouri (22-SW-00399-WBG), and 4021 Mersington Avenue, Kansas City, Missouri (22-SW-00402-WBG). The combined affidavit in support of the foregoing warrants is incorporated herein by reference and included as Attachment C.

*Target Device 1*

25.     On June 23, 2022, ATF agents arrived at 3340 Elmwood Avenue, Kansas City, Missouri, to execute the residential search warrant and arrest warrant for **LUMPKIN**. Agents took **LUMPKIN** into custody in his bedroom in the basement of the residence. In **LUMPKIN**'s bedroom, agents recovered: **Target Device 1**, located on the bed; an FN Herstal model 57 pistol, bearing serial number 386389821, which was equipped with an extended magazine loaded with 29 rounds of live ammunition; two additional magazines for the FN Herstal pistol; 159 rounds of additional live ammunition; 96 assorted prescription pills; a bag containing 145 multicolored pills, which field-tested positive for methamphetamine; a digital scale; and various bags and packaging materials. Agents also recovered another digital scale and bag containing suspected marijuana, located in the cushion of **LUMPKIN**'s wheelchair.

11

***Target Devices 2 and 3***

26.     On June 23, 2022, ATF agents arrived at 4021 Mersington Avenue, Kansas City, Missouri, to execute the residential search warrant and arrest warrant for **JONES**. Agents took **JONES**, who was the only person present, into custody in his bedroom. In **JONES**'s bedroom, agents recovered: a black bag containing assorted multicolored pills, which field-tested positive for methamphetamine; a Glock model 36 pistol, bearing serial number GKD843, loaded with five rounds of live ammunition; a 3D printed drop-in auto-sear, for converting a Glock pistol to a fully automatic fire; and suspected counterfeit Percocet pills containing fentanyl. On the living room couch, agents found a black zippered bag containing **Target Device 2** and a bag of suspected counterfeit Percocet pills containing fentanyl.

27.     Agents found **Target Device 3** (a laptop) in a suitcase in a seemingly unoccupied bedroom. The only two individuals residing at the house were **JONES** and the mother of his children. However, according to **JONES**, the mother of his children had been taken into custody by the KCPD the day prior to the search. **JONES** was the only person present at the residence at the time of the search.

***Target Devices 4 and 5***

28.     On June 23, 2022, ATF agents arrived at 4022 Benton Boulevard, Kansas City, Missouri, to execute the residential search warrant and arrest warrant for **JACKSON**. **JACKSON** was not present at the residence and agents were therefore unable to arrest him at that time. During the residential search, however, agents recovered two Apple iPhones, **Target Device 4** and **Target Device 5**, which were located on top of a dresser in a bedroom that was identified as **JACKSON**'s by his mother, who was present at the time of the search. The room was also confirmed as **JACKSON**'s based on indicia located in the room.

12

29.     During the course of the investigation in this case, an ATF agent serving in an undercover capacity ("UCA") conducted undercover purchases of illegal narcotics from **JACKSON** over social media that, based upon my experience as outlined below, I believe were conducted using iPhones such as **Target Device 4** and **Target Device 5**.

30.     On January 19, 2021, the UCA contacted **JACKSON** over social media after **JACKSON** posted an advertisement for marijuana on Facebook, pictured below.



**JACKSON** subsequently directed the UCA to come to his residence, where the parties conducted a sale of a small amount of marijuana. **JACKSON** also provided the UCA with the phone number (816) 665-3168, and told the UCA to call him later in the day after **JACKSON** had been resupplied.

31.     On February 8, 2021, the Honorable Jill A. Morris, United States Magistrate Judge, Western District of Missouri, signed seven warrants authorizing the search of a number of Facebook accounts associated with **CCG**, including the Facebook account bearing username vince.jackson.5201, believed to belong to **JACKSON**. A review of the account revealed over 100 conversations regarding the purchase and sale of illegal narcotics, as well as multiple conversations regarding gang violence. In addition to the content on **JACKSON**'s Facebook Messenger conversations, the data also revealed the particular mobile devices used to access the account.

13

According to the report provided by Facebook, **JACKSON**'s account was linked to an iPhone 11 beginning in January 14, 2021, and an iPhone 9 beginning in February 25, 2021. Again, both Target Device 4 and Target Device 5 are iPhones.

32.     On December 8, 2021, the UCA contacted **JACKSON** on Facebook Messenger to inquire about the purchase of purported MDMA pills. **JACKSON** agreed to sell 15 pills to the UCA, and again directed the UCA to his residence. When the UCA arrived, **JACKSON** met the UCA at the window and sold the pills. During the transaction, the UCA observed **JACKSON** holding what appeared to be an iPhone in his left hand the entire time.

### *Target Devices 6 and 7*

33.     On June 23, 2022, ATF agents arrived to execute the arrest warrant for **FLUKER** at his known residence at 350 East Armour Boulevard, Apartment 812, Kansas City, Missouri. **FLUKER** was present at the apartment and was taken into custody. Agents then applied for, and were granted, a warrant authorizing the search of **FLUKER**'s apartment, which was issued by the Honorable Lajuana M. Counts, United States Magistrate Judge, Western District of Missouri (22-SW-00408-LMC). During execution of that search warrant, agents recovered: a Taurus Millennium PT111 pistol equipped with an extended magazine loaded with 34 rounds of live ammunition, an additional magazine for the Taurus pistol containing 12 rounds of live ammunition, and **Target Device 6**, all located by **FLUKER**'s bed; **Target Device 7**, located under a chair in the living room; and three digital scales, three bags of suspected marijuana, three bags of multicolored pills (which field-tested positive for methamphetamine), $294 in U.S. currency, and two bank debit cards, all located above the kitchen cabinets in close proximity to each other.

34. **FLUKER**'s girlfriend was also present at the residence at the time of his arrest. However, after a short interview, she was allowed to leave the residence with her personal effects, which included her cell phone.

35. From my training and experience, I know that drug dealers often maintain multiple phones in an effort to avoid detection by law enforcement. I further know that drug dealers often keep a phone solely for the purpose of maintaining contact with established narcotics customers— often referred to as a "trap phone." Typically, a cheaper and lower quality phone is used for a trap phone, as it is only needed for phone calls and text messaging and, due to the illegal nature of its use, must be disposed of and replaced often. I am also aware **Target Device 7** is a One Plus brand phone, which is a relatively inexpensive phone compared to an iPhone. Based on the fact that there was only one other person residing with **FLUKER** (his girlfriend), who left the residence with her cell phone and made no mention of owning another phone, coupled with the location and brand of **Target Device 7**, I believe that **Target Device 7** was being used, or was previously used and discarded, in furtherance of **FLUKER**'s drug trafficking activities.

36. Based on my training and experience, I am familiar with the methods of operation employed by firearms and narcotics traffickers operating at the local, state, national, and international levels, including those involving the distribution, storage, and transportation of illegal firearms and narcotics. I am aware that individuals involved in illegal activity commonly use cell phones in furtherance of those crimes.

37. The **Target Devices** are currently in the lawful possession of ATF Kansas City and are being stored in the ATF Kansas City Group VII Property and Evidence vault in Kansas City, Missouri, within the Western District of Missouri. In my training and experience, I know that the **Target Devices** are being stored in a manner in which their contents are, to the extent material to

15

this investigation, in substantially the same state as they were when the **Target Devices** first came into ATF's possession on June 23, 2022.

## **TECHNICAL TERMS**

38.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     Cellular telephone: A cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include Global Positioning System ("GPS") technology for determining the location of the device.

b.     Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash

16

memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.      Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.      GPS: A GPS navigation device uses the Global Positioning System (generally abbreviated "GPS") to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

17

e.    PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data, and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

f.    IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0–255, separated by periods (*e.g.*, 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.    Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

18

39.     Based on my training, experience, and research, I know that the **Target Devices** have capabilities that allow them to serve as, but not limited to: cellular telephones, digital cameras, portable media players, GPS navigation devices, and PDAs. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

40.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

41.     *Forensic evidence.* As further described in Attachments B1-B7, these applications seek permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrants, but also forensic evidence that establishes how the **Target Devices** were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic evidence might be on the **Target Devices** because:

        a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

        b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

        c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

19

conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrants.

e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

42.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of the **Target Devices** consistent with the warrants. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **Target Devices** to human inspection in order to determine whether they are evidence described by the warrants.

43.     *Manner of execution.* Because these warrants seek only permission to examine devices already in possession of law enforcement, the execution of these warrants does not involve the physical intrusion onto a premises. I therefore submit that there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night.

## **CONCLUSION**

44.     For the foregoing reasons, I respectfully submit that there is probable cause to believe that the **Target Devices** presently contain or constitute evidence of violations of 21 U.S.C. §§ 841(a) and 846, that is, manufacturing, distributing, or dispensing a controlled substance and conspiracy to manufacture, distribute, or dispense a controlled substance; 18 U.S.C. § 924(c), that is, possession of a firearm in furtherance of a drug trafficking crime; and 18 U.S.C. §§ 1959 and 1962, that is, violent crimes in aid of racketeering activity and racketeering. I therefore request warrants to search the **Target Devices** described in Attachments A1–A7 for the items set forth in Attachments B1–B7.

FURTHER YOUR AFFIANT SAYETH NAUGHT.


_____
Stephen T. White
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives


Subscribed and sworn to before me via telephone or other reliable electronic means on this _____ 27th day of July 2022.          By telephone at 3:33 pm


_____
HONORABLE W. BRIAN GADDY
United States Magistrate Judge
Western District of Missouri

21